IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>REVEL AC, INC., et al.,<br><br>        Debtors. | HONORABLE JEROME B. SIMANDLE<br><br>Civil Action Nos.<br>15-299 (JBS), 15-302 (JBS),<br>15-317 (JBS), 15-352 (JBS) |
| IDEA BOARDWALK, LLC,<br><br>        Appellant,<br><br>    v.<br><br>REVEL AC, INC.,<br><br>        Appellee. | ON APPEAL FROM AN ORDER OF THE<br>UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br><br>[Case No. 14-22654 (GMB)]<br><br>**OPINION** |
| ACR ENERGY PARTNERS, LLC,<br><br>        Appellant,<br><br>    v.<br><br>REVEL AC, INC.,<br><br>        Appellee. | |
| IGT,<br><br>        Appellant,<br><br>    v.<br><br>REVEL AC, INC.,<br><br>        Appellee. | |

```
AMERICAN CUT AC MARC FORGIONE,
LLC, et al.,
           Appellants,

      v.

REVEL AC, INC.,

           Appellee.
```

**SIMANDLE, Chief Judge:**

## Table of Contents

I.   INTRODUCTION ............................................. 3

II.  BACKGROUND ............................................... 6

 A.  Factual and Procedural Background ...................... 6

III. STANDARD OF REVIEW ...................................... 18

IV.  DISCUSSION .............................................. 21

 A.  The 365(h) Appellants' Motions ........................ 21

   1.  The Circumstances of this Action Do Not Warrant the
   Imposition of a Partial Stay of the Bankruptcy Court's
   January 8, 2015 Sale Order Pending Appeal ............... 21

     a.  Likelihood of Success on the Merits ............... 21

       i. The 365(h) Appellants Have Not Demonstrated a
       Likelihood of Success on their Argument Concerning the
       Interplay between Section 365(h) and Section 363(f) .... 22

       ii. ... The 365(h) Appellants Have Not Demonstrated a Strong
       Likelihood of Success on their Argument Concerning the
       Presence of Bona Fide Disputes under Section 363(f)(4). 27

         a. ACR ............................................... 30

         b. Amenity Tenants ................................... 32

         c. IDEA .............................................. 34

       iii. . The 365(h) Appellants Have Not Demonstrated a Strong
       Likelihood of Success on their Argument Concerning the
       Requirement of Adequate Protection under 363(e) ....... 36

     b.  The 365(h) Appellants Will Not Suffer Irreparable Harm
     in the Absence of a Stay ............................... 39

     c.  The Debtors May Face Substantial Injury in the Event of
     a Stay ................................................. 41

    d.   The Public Interest Militates Against a Stay ........ 45

  B.   IGT's Motion to Stay ................................. 48

V.   CONCLUSION........................................... 50

## I.   INTRODUCTION

These matters arise out of the chapter 11 proceedings of the beleaguered and now defunct Revel Casino in Atlantic City, New Jersey.  Presently before the Court are the various appeals of the Order of the Honorable Gloria M. Burns, United States Bankruptcy Judge (hereinafter, the "Bankruptcy Court"), approving the sale and purchase of the assets of Revel AC, Inc., et al. (hereinafter, the "Appellants" or "Debtors"), free and clear of liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(f) (hereinafter, the "Sale Order").

As relevant here, the Sale Order provided that "the sale of Debtors' Assets pursuant to 11 U.S.C. § 363(f) shall be free and clear of existing tenancies and/or possessory rights, irrespective of any rights a tenant may hold under 11 U.S.C. § 365(h), including, but not limited to, all possessory rights" under 11 U.S.C. § 365(h) (hereinafter, the "Sale Order").

The Appellants are comprised of four groups, with both related and distinct property interests in the Debtors' assets:

1. IDEA Boardwalk, LLC (hereinafter, "IDEA"), the Appellant in IDEA Boardwalk, LLC v. Revel AC, Inc., Civil Action No. 15-299 (JBS), operated 3 nightlife venues within the Debtors' casino pursuant to an agreement entered into on May 12, 2012.

3

2. American Cut AC Marc Forgione, LLC, Azure AC Allegretti, LLC, GRGAC1, LLC, GRGAC2, LLC, GRGAC3, LLC, Lugo AC, LLC, Mussel Bar AC, LLC, PM Atlantic City, LLC, RJ Atlantic City, LLC, and The Marshall Retail Group, LLC (collective, the "Amenity Tenants"), the Appellants in American Cut AC Morgione LLC, et al. v Revel AC, Inc., Civil Action No. 15-xxx (JBS), similarly operated an array of food, liquor, and retail establishments within the Debtors' casino, in connection with multiple "Lease" Agreements.

3. ACR Energy Partners, LLC (hereinafter, "ACR," and together with IDEA and the Amenity Tenants, the "**365(h) Appellants**"), the Appellant in ACR Energy Partners, LLC v. Revel AC, Inc., Civil Action No. 15-302 (JBS), acted as the Debtor's exclusive provider of hot and chilled water, electric, and other power pursuant to an Energy Sales Agreement dated April 11, 2011.  In addition, ACR agreed to construct and operate a central utility plant on property leased by ACR from the Debtors pursuant to a Lease Agreement dated April 8, 2011, in which ACR agreed to pay an annual rental rate of approximately $198,000, payable in monthly installments of approximately $16,500.

4. International Game Technology (hereinafter, "IGT"), the Appellant in IGT v Revel AC, Inc., Civil Action No. 15-317 (JBS), by contrast, sold gaming machine to the Debtors, and provided the financing in connection with such sale.  As a result, IGT purports to hold a perfected purchase money security interest in the provided equipment.

Despite the variance in their respective interests, the Appellants have somewhat aligned legal positions, at least in part, in connection with the pending appeals—all argue that the Bankruptcy Court erred in entering a Sale Order that dispossessed them of their purportedly protected property right in the Debtor's Assets, without appropriately accounting for and protecting such rights.

The 365(h) Appellants specifically argue that the Bankruptcy Court erred in three, alternative respects. First,

the 365(h) Appellants argue that the Bankruptcy Court erred in permitting a sale of the Debtors' Assets free and clear of the Appellants' leaseholds under section 363(f), despite their purported right to possess under section 365(h);[1] second, even if section 363(f) trumps the possessory interests provided under section 365(h), the 365(h) Appellants, joined by IGT, insist that the Bankruptcy Court erred in finding that the Debtors met their burden to demonstrate the statutory prerequisites for a sale free and clear of claims, liens, and/or encumbrances under section 363(f)(1)-(5); and third, Appellants assert that the Bankruptcy Court permitted a sale free and clear under section 363(f), without providing the Appellants' adequate protection, as required under section 363(e).

Appellants now move, on an emergent basis,[2] to stay paragraphs 5 and 14 of the Sale Order pending appeal, in order

---

[1] The IGT Appellant, as a secured creditor, make no argument under section 365(h).

[2] The motions for stay pending appeal were filed on January 16, 2015 by all appellants.  The "Amenity Tenants" initially filed their motion in the IDEA Boardwalk action [Docket Item 7 in 15-299], in light of the fact that an individual appeal docket had not yet been opened by the Clerk of Court, and such opening did not, in light of an intervening Court holiday, occur until January 20, 2015.  Nevertheless, briefing by all parties to the appeals was completed on January 19, 2015.  Additional submissions were made by Wells-Fargo as Debtor-in-Possession Agent and by the prospective purchaser, Polo North County Club, Inc. The parties all agree that the automatic stay under Federal Rule of Bankruptcy Procedure 6004(h) expires on January 22, 2015.  The Court has, accordingly, entertained this motion on an expedited basis, and conducted a hearing on January 20, 2015.

to prevent the purportedly irrevocable dispossession of their contracted-for property interests, claims, and/or liens, and to prevent a consummated sale under the Sale Order from rendering their claims on appeal statutorily moot under section 363(m). The Debtors, by contrast, assert that none of the applicable factors militate in favor of a stay, particularly because the harm derived from such a stay would purportedly far outweigh any incidental benefit preserved for appeal.

The principal issues before the Court are whether the Appellants demonstrate a likelihood of success on the merits; whether, in the absence of a stay, Appellants will likely suffer an irreparable injury; whether the imposition of a stay would result in substantial injury to Debtors; and whether the public interest favors, or weighs against, the requested stay.

For the reasons that follow, the Court will deny the Appellants' motions for a partial stay pending appeal.

## II.   BACKGROUND

### A. Factual and Procedural Background

For the purposes of the pending motion, the Court need not retrace every facet of the parties' lengthy history.  Rather, for present purposes, it suffices to note that, on June 19, 2014, each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq., and continued to manage their properties as

6

debtors in possession.  In connection with their initial filings, the Debtors moved for (i) authorization to implement certain bid procedures in connection with the proposed sale of the Debtors' assets, (ii) to schedule an auction and sale hearing, (iii) approval of assignment procedures, and (v) authorization and approval of the sale of the Debtors' assets free and clear of liens, claims, encumbrances, and interests (hereinafter, the "Sale Motion").

In response to the Sale Motion, the Appellants filed limited objections to the Debtors' request to sell the Debtors' assets free and clear of liens, claims, encumbrances, and interests, and generally argued, as here, that any contemplated sale of assets must be subject to the Appellants' possessory leasehold interests pursuant to section 365(h) of the Bankruptcy Code and/or secured lien.[3]  (See, e.g., Martin Aff., Ex. G (Amenity Tenants' Objections); ACR's Br. at 12; IDEA's Br. at 5; see generally IGT's Br.)  Notwithstanding the objections, the Bankruptcy Court entered an order approving the bidding procedures for the sale of the Debtors' assets on July 14, 2014, and scheduled an auction of the Debtors' assets to occur on August 7, 2014.

---

[3] Contemporaneously, IDEA commenced an adversary proceeding, seeking, among other things, a judgment declaring the Debtors' agreement with IDEA a lease under applicable law.

Despite receiving several bids prior to the initial auction date, none constituted "Qualifying Bids" under the bidding procedures approved by the Bankruptcy Court.[4]  Nevertheless, the Debtors continued to market the Debtors' assets, and ultimately reached an agreement with Polo North Country Club, Inc. (hereinafter, "Polo North") to act as the stalking horse bidder in connection with a new auction of the Debtors' assets.

The executed asset purchase agreement with Polo North (hereinafter, the "APA") provided for the acquisition by Polo North of all of the Debtors' assets, "free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities)," including, in relevant part, all assumed contracts.  (Martin Aff., Exs. E, F.)  The "Sellers Disclosure Letter" to the APA, in turn, defined the "Permitted Encumbrances" to include the "Leasehold Interests" of IDEA and the Amenity Tenants, and included ACR's "Energy Sales Agreement" and "Nonresidential real property lease agreement" in the list of "Assumed Contracts."  (Id.)  Consequently, the APA did not require the Debtors to transfer their assets to Polo North free

---

[4] As a result, the Debtors "continued to incur substantial operating losses," and sought approval to cease operations from the New Jersey Division of Gaming Enforcement.  (Debtors' Opp'n at 6.)  Following approval, the Debtors ceased all operations at their facilities on September 2, 2014, requiring Appellants' related businesses to be closed.  (Id.)  The power plant of ACR, however, continues to furnish energy necessary to maintain the closed Revel property.

and clear of the Appellants' leases.  The APA did, however, provide that the Debtors would "use commercially reasonable efforts to sell free and clear of all leasehold interests." (Id.)  Moreover, the APA permits Polo North to terminate the agreement upon the occurrence of certain conditions, subject to forfeiture of Polo North's $10 million deposit.  (Id. at § 14.14(a) ("In the even that this Agreement is not performed by Purchaser in accordance with its specific terms or is otherwise breached, or threatened to be breached, by Purchaser or Purchaser fails to consummate the Closing as required hereunder, Sellers' sole and exclusive remedy shall be their right to retain the Purchaser Deposit Amount.").)

Following the Bankruptcy Court's approval of modified bid procedures and of the stalking horse agreement with Polo North, the Debtors conducted additional auctions on September 24, 2014, September 30, 2014, and October 1, 2014.  Thereafter, the Debtors announced the selection of Brookfield US Holdings, LLC (hereinafter, "Brookfield") as the successful bidder, with a bid of $110 million, thereby placing Polo North's $94.5 million cash bid in the position of back-up winning bidder.  About six weeks later, however, on November 19, 2014, Brookfield repudiated its agreement to purchase the Debtors' assets, and forfeited its $11 million deposit.  The Bankruptcy Court thereafter approved the Debtors' decision to terminate the Brookfield sale.  The

9

Termination Order, however, preserved all objections requiring further hearing under the Brookfield Sale Order, and scheduled a hearing to approve a sale to Polo North for January 5, 2015.

In advance of such hearing, Polo North filed an unusual objection to the Debtors' motion to approve the Polo North sale. In addition, Polo North submitted a proposed order, providing, in accordance with the APA, that the Debtors' assets be transferred to Polo North free and clear of liens, claims, encumbrances and interests, other than Permitted Encumbrances and Assumed Liabilities.  The proposed order also provided, however, that that any existing lease, other than those that constitute an Assumed Contract, be "deemed rejected by the Debtors and the Assets shall be transferred to Polo North free and clear of any interest of such non-Debtor party pursuant to section 365(h)."

In the wake of Polo North's objection (and proposed order), the section 365(h) Appellants similarly filed limited objections to the Debtors' proposed sale to Polo North.  The section 365(h) Appellants specifically argued, as here, that section 365(h) forbade the Debtors from selling the Debtors' assets free and clear of the their interests, and alternatively argued that, in any event, the Debtors failed to satisfy any of the necessary preconditions to a section 363(f) sale.  As a final alternative objection, the section 365(h) Appellants argued that, in the

10

event the Bankruptcy Court approves a section 363(f) sale, they
must receive adequate protection of their interest pursuant to
section 363(e).[5]   No present party objected to the sale price as
being insufficient, nor did they object to the selection of the
Awardee, Polo North.

The Debtors thereafter filed an omnibus reply to all of
Appellants' objections, arguing, in accordance with Polo North's
proposed order, that section 363(f) permits a sale free and
clear of leasehold interests despite section 365(h).  (See
Martin Aff., Ex. I.)  In addition, the Debtors argued that "bona
fide disputes exist with respect to the validity of the
leasehold interests" asserted by the Appellants, and therefore
insisted that the Debtors met their burden to demonstrate one of
the qualifying conditions for a free and clear sale under
section 363(f), namely, that the disputed interests remain "in
bona fide dispute," 11 U.S.C. § 363(f)—arguments purportedly
never before raised in connection with the bankruptcy
proceeding.  (Id.; see also IDEA's Br. at 8; Amenity Tenants'
Br. at 8; ACR's Br. at 12.)

---

[5] The Debtors assert that IDEA failed to raise this objection
below.  (Defs.' Opp'n at 29-32.)  The Court, however, rejects
this assertion.  In filing a limited objection on December 30,
2014, IDEA restated and reaffirmed the objections IDEA
previously raised with respect to the Brookfield Sale, including
its joinder of all objections asserted by the Amenity Tenants.
Consequently, the Court finds the objections preserved on
appeal.

The Bankruptcy Court conducted a Polo North Sale Hearing over two days, on January 5 and January 8, 2015.  The record before the Bankruptcy Court included the submissions of the various parties at interest stemming back to the Chapter 11 filing and adversary actions or motions involving the Debtors, ACR and IDEA, as more fully discussed below.  In discussing Polo North's position that the Debtors' assets be sold free and clear of any interest under section 365(h), counsel for Polo North commented that,

> We're in the Bankruptcy Court on this building for a reason. And Mr. Straub's working with other people, as you know, we mentioned that on Tuesday. And certain things for this building to work, for it to be profitable, for us to be able to move forward and not just give you $10 million which will disappear in a month and a half. . . . You know, certain things really, as a practical matter, have to happen. Our understanding, it's our belief that where these amenity tenants are located, essentially prevent an appropriate use of the building. . . . So, you know, essentially we're – if you don't rule the way the debtor has suggested, we're buying the pig in the poke, which nobody's comfortable with. . . .But the one thing that we do know is, certainly the locations are problematic. And, honestly, from the standpoint of the Amenity Tenants, I would think they'd want to be in a position where when the building is up and running they're frankly in a more profitable location anyway. I really believe that this language proposed by the debtor is in everybody's interest. . . . [And Polo North has certainly not ruled out negotiation with some of these asserted tenants for space]. . . You know, again, it's all going to depend on the choreography of the building, so to speak.

(Brown Cert., Ex. B1 at 34:13–35:25.)

The Bankruptcy Court had also presided over the previous failed efforts to sell the Revel property to Brookfield and its decision to walk away from the deal and lose $11 million, as well as the enormous monthly carrying costs accruing to the Debtors, quantified as $8-11 million per month since the $2 billion property was shuttered in September, 2014. (See Martin Dec. at ¶ 22 (discussing the "'burn rate' of approximately $8-11 million per month).)

In ruling upon the various objections to the proposed Sale Order, the Bankruptcy Court first considered IGT's request that its secured interest be adequately protected through an express provision in the Sale Order indicating IGT's entitlement to receive a specific, segregated portion of the sale proceeds. (See Martin Aff., Ex. K at 90-101:1.)  In rejecting IGT's position, the Bankruptcy Court specifically noted that IGT would, given its secured position, be entitled to a lien on the sale proceeds, and therefore rejected IGT's claim that the Sale Order effected a loss of IGT's "valuable" right.[6]  (Id. at 96:19-24, 98:7-8.)  Moreover, in response to counsel for IGT's various arguments concerning the inevitable post-sale disputes over the

---

[6] Despite its ruling concerning the Sale Order, the Bankruptcy Court noted IGT's pending motion for stay relief, and stated that IGT would obtain "stay relief," in the event IGT's interests were not adequately protected.  (See Martin Aff., Ex. K at 91:18-22.)

secured creditors' priority positions (and position in line to
receive a distribution from the sale proceeds), the Bankruptcy
Court indicated that IGT's challenges would be preserved, and
that IGT would be heard on that issue following receipt by the
Debtors of the sale proceeds, and prior to any distribution.
(Id. at 99:7-18.)

        With respect to the 365(h) Appellants, the Bankruptcy Court
found the Court of Appeals for the Seventh Circuit's reasoning
in Precision Industries, Inc. v. Qualitech Steel SBQ, LLC, 327
F.3d 537 (7th Cir. 2003), reh'g denied, (2003), "appropriate,"
because section 365(h) and 363(f) "deal with two separate and
distinct things." (Brown Cert., Ex. B1 at 51:9-52:9.)  In
Qualitech, the Seventh Circuit, the only court of appeals to
address this issue, held that section 363(f) of the Bankruptcy
Code, which permits the sale of property free and clear of the
possessory interest of a tenant, governs the debtor-in-
possession's sale of the debtor's property, while the more
protective provision of section 365(h) applies to a different
event, namely, the rejection of a lease or executory contract;
in other words, that the terms of section 365(h) do not
supersede those of section 363(f) when the trustee or debtor-in-
possession seeks to sell property in which it is the lessor.
Qualitech, 327 F.3d at 547-48.  The Seventh Circuit reconciled
the two Code provisions accordingly, directing that only section

                                14

363(f) be satisfied in the present circumstances of the liquidation sale.  Id. at 548.

The Bankruptcy Court, in turn, concluded that section 365(h) deals, on the one hand, with "the assumption and rejection[] of leases and executory contracts," enabling the leaseholder to "opt[] to stay in possession" in the event the trustee or debtor "decides to reject a lease."  (Id. at 51:13-17.)  Section 363(f), by contrast, deals a debtor's decision "to liquidate and asset," and provides that such assets "can be sold free and clear of any liens, encumbrances, or interests," provided that the trustee or debtor-in-possession meets one of the section 363(f) requirements.  (Id. at 52:3-20.)  In that regard, the Bankruptcy Court agreed with Qualitech, and concluded that the Debtors can proceed to a free and clear sale, provided that they meet their burden to demonstrate one of the requirements of section 363(f).

The decision in the Bankruptcy Court with regard to the 365(h) Appellants, accordingly, turned to whether the Debtors "showed enough to assert [a] bona[]fide dispute in regards to the interests" of the Appellants under section 363(f)(4).  (Id. at 52:25-53:2.)  In so considering, the Bankruptcy Court noted that the Debtors did not provide "any of the leases or, really, a lot of – or any, really, evidence in support of its position of the bonafide dispute," and recognized it lacked the time

15

necessary to conduct "a full hearing" on the merits, or to
evaluate the issue "totally" in accordance with "what the law
requires." (Id. at 53:3-8, 55:3-5.) Indeed, had time not been
"of the essence," the Bankruptcy Court specifically stated that
it would have deferred determination of these issues "to have
more evidence presented." (Id. at 55:12-13.)

Nevertheless, based upon the proffers and the parties'
submissions, as well as the pertinent records of the bankruptcy
case filings, the Bankruptcy Court concluded, that because "the
ACR lease is so integrally related to a lot of other documents"
that a dispute could exist concerning "whether it's actually a
true lease." (Id. at 53:15-21.) With respect to the other
entities the Bankruptcy Court turned to documents "filed early
in the case" by the Amenity Tenants, which described the Amenity
Tenants as "partners of the [D]ebtors," with "a tangible and
particular interest in the debtor[s'] efforts to sell their
assets." (Id. at 53:22-54:23.) The Bankruptcy Court was also
necessarily aware that IDEA itself had placed the status of its
agreement in dispute by seeking a declaratory judgment that it
is a lease, although this fact was not specifically referenced
by the Bankruptcy Court's decision.

Consequently, based upon "the fact that all of the parties"
expressed a need "to move expeditiously," the Bankruptcy Court
found that the Debtors met their burden of showing "a

16

bonafide[d] issue in dispute," and determined the sale should proceed over the Appellants' objections because the Debtors satisfied section 363(f)(4).  (Id. at 55:17-19.)  The Bankruptcy Court thereafter denied the Debtors' request for a waiver of the automatic 14-day stay under Federal Rule of Bankruptcy Procedure 6004(h), (see id. at 65:11-69:15), in addition to the Appellants' informal applications for a stay pending appeal. (See id. at 69:21-75:5.)  Following the Bankruptcy Court's rulings, the Bankruptcy Court and counsel for Polo North engaged in the following colloquy:

> **Mr. Moskovitz**: Just so everybody understands, [Polo North is] expecting to negotiate.  I don't expect that at the closing.  We have until three days before the closing.  We have until three days before the closing. We haven't rejected [the leases] yet.  Okay?  And so we have until three days before closing to do that. We may or may not reject it. That depends upon how the negotiations go. And I'm sure that if the parties are negotiating in good faith, we can even go beyond the closing as part of the negotiation.

> **The Court**: Right.  And I mean, I – what I ruled was, it can be sold free and clear.

> **Mr. Moskovitz**: Right.

> **The Court**: I didn't say that it has to be sold free and clear.

> **Mr. Moskovitz**: Exactly.

(Brown Cert., Ex. B1 at 64:20-65:3.)  Polo North's counsel repeated similar intentions of post-sale negotiations at the hearing upon the present motions.

17

On January 8, 2015, the Bankruptcy Court thereafter entered the Sale Order, which memorialized its January 8, 2015 ruling. The Sale Order noted Polo North's "decision to exclude all executory contracts, unexpired leases and intellectual property rights from being an Assumed Contract in accordance with the Agreement," thereby effectuating a rejecting of such leases. The Sale Order further provided, in relevant part, that

> Notwithstanding anything to the contrary in the Agreement or this Sale Order, the sale of the Debtors' Assets pursuant to 11 U.S.C. § 363(f) shall be free and clear of existing tenancies and/or possessory rights, irrespective of any rights a tenant may hold under 11 U.S.C. § 365(h), including, but not limited to, all possessory rights under section 365(h) of the Bankruptcy Code of each of the tenants comprising the Leasehold Interests identified in Section 1.1(b) of the Seller's Disclosure Letter; provided that the effectiveness of the sale of the Assets free and clear to the Purchaser under the Agreement and this Order shall be concurrent with the occurrence of the Closing.

(See Brown Cert., Ex. A.)  The Appellants filed timely appeals, and the pending emergent motions to stay followed shortly thereafter.

## III. STANDARD OF REVIEW

The district court has jurisdiction over appeals from the bankruptcy court pursuant to 28 U.S.C. § 158(a).  In considering such appeals, this Court reviews the bankruptcy court's factual findings under a clear error standard, see Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999), "but exercise[s] 'plenary review of the [bankruptcy]

18

court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Commcn's, Inc., 945 F.2d 635, 642 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)).  Mindful of this standard, the Court turns to the analysis that governs the pending emergent motions.

Bankruptcy Rule of Procedure 8007 generally requires that a party seeking "a stay of a judgment, order, or decree of the bankruptcy court pending appeal" first seek such relief in the bankruptcy court.  FED. R. BANK. P. 8007(a)(1)(A).  In the event the bankruptcy court denies the party's request to stay pending appeal, as here, the party may then move before the district court for a stay pending appeal.

However, a stay constitutes an "extraordinary remedy," to be granted in only limited circumstances. In re W.R. Grace & Co., 475 B.R. 34, 205 (D. Del. 2012). Consequently, in order to qualify for a stay of an Order of the Bankruptcy Court, the party seeking a stay pending appeal must demonstrate the same factors required of a party seeking a preliminary injunction. Namely, the movant bears the burden of showing the following four factors: (1) a likelihood of success on the merits of the appeal; (2) that the movant will suffer substantial irreparable injury if the stay is denied; (3) substantial harm will not be

19

suffered by other parties if the stay is granted; and (4) that issuance of the stay would not harm the public interest.  See Rep. of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991) (citing Hilton v. Braunskill, 481 U.S. 770 (1987); In re Scarborough, 389 F. App'x. 184 (3d Cir. 2010); Ferrone v. Cardiello, 516 B.R. 765, 766 (W.D. Pa. Sept. 29, 2014).

These stay factors require individualized judgments and weighing based upon the circumstances of each particular case and, accordingly, should not be applied rigidly.  See In re LCI Holding Co., Inc., 519 B.R. 461, 465 (D. Del. 2014) (citing In re Calabria, 407 B.R. 671, 678 (Bankr. W.D. Pa. 2009) ("[F]ailure to satisfy any one of the four factors ... might not necessarily be fatal to a motion for stay pending appeal. Rather, to determine whether a stay pending appeal is warranted, the court is to balance each of the factors at issue and examine individualized considerations relevant to the case.")). Moreover, "'[i]t is well-settled that the decision of whether to grant or lift a stay is committed to the sound discretion of the court.'" In re DiClemente, No. 12-1226, 2012 WL 5211942, at *2 (D.N.J. Oct. 22, 2012) (citations and internal quotation marks omitted).

In Part IV.A below we will address these factors in regard to the motions of the "365(h) Appellants" in Civil Nos. 15-299,

20

15-302, and 15-352, and then in Part IV.B below we will address the circumstances of Appellant IGT in Civil No. 15-317.

## IV.  DISCUSSION

### A. The 365(h) Appellants' Motions

#### 1. The Circumstances of this Action Do Not Warrant the Imposition of a Partial Stay of the Bankruptcy Court's January 8, 2015 Sale Order Pending Appeal

##### a. Likelihood of Success on the Merits

In considering the likelihood of success on the merits, courts focus on whether the movant seeks to raise "'substantial'" and "'serious'" issues on appeal that, "'so as to make them fair ground for litigation.'"[7]  <u>In re Freedom Commcn's Holdings, Inc.</u>, No. 09-13046, 2009 WL 4506553, at *1 (D. Del. Dec. 4, 2009) (quoting <u>In re Calabria</u>, 407 B.R. 671, 678 (Bankr. W.D. Pa.2009) (citations omitted)).  In other words, "[l]ikelihood of success on the merits means that a movant has a 'substantial case,' or a strong case on appeal.'"[8]  <u>In re</u>

---

[7] For that reason, the Court rejects the 365(h) Appellants' assertion that any lesser standard of likelihood applies in this instance.  (<u>See, e.g.</u>, Amenity Tenant's Br. at 14.)  Indeed, any such lesser standard would be inconsistent with the "strong showing" cited as part of the standard applicable to the pending motion by the 365(h) Appellants' briefs.  (<u>See, e.g.</u>, ACR's Br. at 18; IDEA's Br. at 19; Amenity Tenants' Br. at 14.)

[8] Moreover, in making such determination, the Court may affirm (or, as here, find no likelihood of success) on any ground apparent from and/or supported by the record.  <u>See, e.g.</u>, <u>Murray v. Bledsoe</u>, 650 F.3d 246, 247 (3d Cir. 2011); <u>Tourscher v. McCullough</u>, 184 F.3d 236, 240 (3d Cir. 1999).

<u>Polaroid Corp.</u>, Nos. 01-10864, 02-1353, 2004 WL 253477 (D. Del. Feb. 9, 2004) (citations omitted).

Here, the 365(h) Appellants argue that their submissions demonstrate a strong likelihood of success on three issues: (1) their positions concerning the interplay between section 365(h) and 363(f); (2) the absence of any bona fide lease dispute under section 363(f)(4); and (3) the requirement of adequate protection under section 363(e).  The Court shall address each argument in turn.

> **i.   The 365(h) Appellants Have Not Demonstrated a Likelihood of Success on their Argument Concerning the Interplay between Section 365(h) and Section 363(f)**

In arguing a likelihood of success on this issue, the 365(h) Appellants concede the unsettled nature of the law concerning section 365(h)'s application to section 363(f) sales. The 365(h) Appellants further concede that no controlling authority exists with respect to this issue. (<u>See, e.g.</u>, ACR's Br. at 24-27; IDEA's Br. at 19-22; Amenity Tenants' Br. at 12-13.)  In that regard, the Bankruptcy Court did not, in rendering a decision, overlook binding precedent, nor failure to appreciate the divergence of opinion evidenced in case law throughout the Nation.  To the contrary, the Bankruptcy Court specifically predicated its determination below upon the Court of Appeals for the Seventh Circuit's Opinion in <u>Precision</u>

Industries, Inc. v. Qualitech Steel SBQ, LLC, 327 F.3d 537 (7th Cir. 2003), reh'g denied, (2003), the only appellate court to have addressed directly addressed the relationship between section 365(h) tenant's rights and the free and clear sale provisions of section 363(f).

Nevertheless, the 365(h) Appellants devote much of their briefing to arguing that the Bankruptcy Court's decision erred in relying upon Qualitech to conclude that the Debtors could proceed to a free and clear sale, despite the 365(h) Appellants' purportedly protected possessory rights under section 365(h). (See, e.g., ACR's Br. at 24-27; IDEA's Br. at 19-22; Amenity Tenants' Br. at 12-13.)

Even though the Court must review the Bankruptcy Court's conclusion in this respect de novo, see In re Makowka, 754 F.3d 143, 147 (3d Cir. 2012) ("Like the District Court, we review the Bankruptcy Court's legal determinations—such as the matter of statutory interpretation before us—de novo), given the undisputed "'split of authority'" concerning this issue, the Court cannot conclude that the 365(h) Appellants have made a substantial showing of likely success on the merits of this issue. (Amenity Tenants' Br. at 12.) Rather, the 365(h) Appellants have, at most, shown a possibility of success, and indeed a close legal issue, and the Court therefore finds this factor, as stated below, in equipoise.

23

For, on the one hand, the Court finds some initial merit to the argument that enabling a debtor to dispossess a tenant through a sale free and clear under section 363(f) would permit a debtor to do indirectly that which it could not do directly under section 365(h).  (See ACR's Br. at 25 (citing cases).)  Indeed, the language of 365(h) makes plain that, if a debtor rejects an unexpired lease, the lessee may elect to retain the lessee's rights in or appurtenant to the real property, including "any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation," for the remainder of the lease term.  11 U.S.C. § 365(h)(1)(A)(ii).  In that regard, section 365 contemplates the retention of at least some portion of the lessee's interest when a debtor, as here, rejects an unexpired lease.[9]  Section 363(f), by contrast, enables a debtor to sell its assets "free and clear of any interest" in such assets, subject to the satisfaction of certain conditions.  11 U.S.C. § 363(f)(1)-(5) (delineating the qualifying conditions for a free and clear sale).  In that regard, the central question presented by the 365(h) Appellants' appeals is whether

---

[9] The 365(h) Appellants leases have not formally been rejected, and the Debtors' motion to reject remains pending in the Bankruptcy Court.  The parties, however, all agree that the leases have, in practical effect, been rejected, subject to approval by the Bankruptcy Court.  Consequently, the formality (or absence of such formality) does not alter the Court's analysis.

section 363(f)'s "any interest" language includes rights under
section 365(h).  Such an interpretation may, however, prove
largely unworkable, because it would, in effect, render two of
the Bankruptcy Code's important provisions irreconcilable.

For that reason, the Bankruptcy Court concluded that
section 365(h) and 363(f) envision "separate and distinct"
situations, because section 365(h) provides a leaseholder with
"the option of opting to stay in possession," primarily where
the debtor or debtor-in-possession continues to operate the
property, abandons the property, or proceeds with a
reorganization. (Brown Cert., Ex. B1 at 51:9-52:9.)  The
Bankruptcy Court, however, concluded that section 363(f), by
contrast, contemplates the scenario in which the debtor seeks to
liquidate or dispossess itself of certain property.  (Id. at
52:3-20.)  In that regard, the Bankruptcy Court found that
section 363(f) enables the property to be sold—and relinquished
from the Debtors' estate—free and clear of any liens,
encumbrances, or interests.  (Id.)  The Bankruptcy Court's
determination in this respect, and reliance on Qualitech's
precedent, also finds support in a recent decision of the
Southern District of New York in Dishi & Sons v. Bay Condos LLC,
510 B.R. 696, 698-99 (S.D.N.Y. 2014) (noting that the "minority
interpretation has certain advantages over the majority view").
In Dishi, the district court principally concluded as follows:

25

> Although § 365(h) is applicable to § 363(f) sales, it
> does not give the lessee absolute rights that take
> precedence over the trustee's right to sell free and
> clear of interests. Rather, it clarifies that the
> lessee may retain its appurtenant rights
> notwithstanding the trustee's rejection of the lease.
> Section 363(f), in turn, authorizes the trustee to
> extinguish the lessee's appurtenant rights—like any
> other interest in property—but only if one of five
> conditions is satisfied with respect thereto. The two
> sections thus work in harmony to establish that the
> lessee's appurtenant rights may not be terminated by
> rejection and must be taken into account in any
> proposed free and clear sale. If § 363(f) authorizes
> the trustee to sell property free and clear of such
> rights, nothing in § 365(h) mandates a contrary
> result.

Id. On the other hand, Appellants argue that the better view

was recently express by the decision, also in this district, in

In re Crumbs Bake Shop, Inc., ___ B.R. ___, 2014 WL 5508177

(Bankr. D.N.J.), in which Judge Kaplan held with respect to an

analogous provision of section 365 dealing with intellectual

property, that a sale by a debtor-in-possession under section

363(f) does not trump the rights granted by section 365(h).

Given the paucity of authority on these issues, and the

absence of any controlling precedent, the Court finds the 365(h)

Appellants' likelihood of success on this issue to be, at this

time, in equipoise, with the potential for an affirmance on this

issue.  Therefore, the Court does not find that the 365(h)

Appellants have demonstrated a likelihood of success on the

merits of this issue on appeal.  See In re Global Home Prods.,

LLC, Nos. 06-508, 06-10340, 2006 WL 2381918, at *1 (D. Del. Aug.

26

17, 2006) (denying a stay pending appeal where the movant failed
to demonstrate "a substantial likelihood of success on the
merits of its appeal).

> ii.  **The 365(h) Appellants Have Not
> Demonstrated a Strong Likelihood of
> Success on their Argument Concerning the
> Presence of Bona Fide Disputes under
> Section 363(f)(4).**

The Bankruptcy Court, as noted, determined that the Debtors
had shown there are "bona fide disputes" concerning whether the
"365(h) Appellants" have a true lease, and that a sale free and
clear is permitted under section 363(f)(4).  In arguing that no
bona fide dispute exists concerning the nature of the disputed
agreements, the 365(h) Appellants argue that the Bankruptcy
Court's determination to the contrary rests upon a "nonexistent"
record, (ACR's Br. at 30), and a misapplication of state real
estate law. (IDEA's Br. at 25-35.)  The 365(h) Appellants insist
that such missteps demonstrate a substantial likelihood of
success on appeal.  (See ACR's Br. at 32.)

In so arguing, however, the 365(h) Appellants ignore both
the standard of review applicable to this inquiry, and the
voluminous (and illuminating) record before the Bankruptcy
Court.  Critically, the determination of whether a debtor meets
the requirements of section 363(f) constitutes a question of
fact, only reviewable on appeal for clear error.  See Hewlett v.
U.S. Bankr. Ct., No.07-05, 2007 WL 3232239, at *1 (N.D. Cal.

27

Oct. 31, 2007) ("[T]he bankruptcy court's conclusion that it had authority to sell the [ ] property free and clear of [the lessee's] possessory interest cannot be deemed "clearly erroneous"); In re Netfax, Inc., 335 B.R.85, 94 (D. Md. 2005) (finding that bankruptcy court's determination that section 363(f) was met "is not clearly erroneous"); In re East Redley Corp., 93 B.R. 348, 350 (E.D. Pa. 1988) (reviewing the bankruptcy court's findings concerning the requirements of section 363(f) for clear error).  Consequently, the Bankruptcy Court's factual finding are only clearly erroneous if they leave this Court "with the definite and firm conviction that a mistake has been committed."  In re Swedeland Dev. Grp., 16 F.3d 552, 558 (3d Cir. 1994).

Consequently, the Court notes that, in order to demonstrate the existence of a bona fide dispute, the Bankruptcy Court need only have found "'an objective basis for either a factual or legal dispute as to the validity of the asserted interest.'"[10] In re Bella Vista Assocs., Nos. 07-18134, 07-2241, 2007 WL

---

[10] In the related context of section 303(h)(1), the Court of Appeals "explained that a bona fide dispute exists '[i]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts.'"  In re Scimeca Foundation, Inc., 497 B.R. 753, 773 (Bankr. E.D. Pa. 2013) (quoting B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Centers, Inc., 865 F.2d 65, 66–67 (3d Cir. 1989) (citation omitted)) (discussing the definition of "bona fide dispute" under section 363(f)(4)).

4555891, at *4 (Bankr. D.N.J. Dec. 18, 2007) (quoting In re N.J. Affordable Homes Corp., No. 05-60442, 2006 WL 2128624, at *10 (Bankr. D.N.J. June 29, 2006) (quoting In re Taylor, 198 B.R. 142, 162 (Bankr. D.S.C. 1996))).  In other words, a party satisfies its burden to demonstrate a bona fide dispute when it articulates some factual or legal dispute concerning the validity of the claim.  In re Atl. Gulf Communities Corp., 326 B.R. 294, 300 n.7 (Bankr. D. Del. 2005) (citation omitted).  Significantly, however, such a standard "does not require the [court] to resolve the underlying dispute or determine the probably outcome of the dispute prior to authorizing a sale pursuant" section 363(f)(4).  In re N.J. Affordable Homes Corp., 2006 WL 2128624, at *10 (citation omitted).  Rather, the court must simply determine "whether such a dispute exists," id. (citation omitted), and that it is "bona fide," that is, not imaginary or far-fetched.

Here, even if the Bankruptcy Court did not review the explicit leases,[11] the Bankruptcy Court had the benefit of the

---

[11] Nor can the Court find that the Bankruptcy Court erred in considering its own knowledge of the bankruptcy proceedings, in addition to the exigent nature of the sale process, rather than upon a more robust record.  To the contrary, certain courts have specifically concluded that "a finding of a 'bona fide dispute' for purposes of § 363(f)(4) depends upon a case-by-case consideration of the following: i) the procedural posture of the case; ii) the need to expedite the sale; and iii) the nature of the basis for determining that a dispute exists."  In re N.J. Affordable Homes Corp., 2006 WL 2128624, at *10 (citing In re

29

voluminous record developed throughout the lengthy bankruptcy proceeding.  In addition, and in connection with the sale hearing, the Bankruptcy Court received the parties' lengthy proffers concerning the various agreements, including specific provisions of those agreements, and heard legal argument concerning the interpretation of such agreements under applicable law.  (See, e.g., Martin Aff., Ex. K at 55:25-61:3, 65:23-66:3.)  Consequently, for the reasons that follow, and in light of the available record below, the Court does not, at this time, find that the 365(h) Appellants have demonstrated a substantial likelihood that the Bankruptcy Court committed clear error.  The Court will address each 365(h) Appellant, in turn.

### a.   ACR

With respect to ACR, the Bankruptcy Court found ACR's ground lease subject to a potential bona fide dispute, given the lease's <u>admittedly</u> integral relationship to other, indisputably, non-lease documents, namely ACR's Energy Supply Agreement with ACR. (Brown Cert., Ex. B1 at 53:15-21.)  In so finding, the

---

<u>Robotic Vision Sys., Inc.</u>, 322 B.R. 502, 506 (Bankr. D.N.H. 2005)).  Therefore, the Bankruptcy Court's decision to resolve to the section 363(f)(4) issue without conducting an evidentiary hearing and/or permitting the parties to engage in discovery does not, without more, render the Bankruptcy Court's determinations clearly erroneous.  Moreover, as stated above, the Court may affirm (or, as here, find no likelihood of success) on any ground apparent from and/or supported by the record.  <u>See, e.g.</u>, <u>Murray</u>, 650 F.3d at 247; <u>Tourscher</u>, 184 F.3d at 240.

Bankruptcy Court relied upon its own knowledge and experience in the bankruptcy proceeding, in addition to its knowledge of ACR's agreements with the Debtors.  (Id.)  The Court therefore notes that ACR's lease specifically provides, in relevant part, that the lease term shall expire "contemporaneously with the expiration" of the Energy Supply Agreement, an agreement that strongly militates toward a contract rather than a lease. (Zakia Aff., Ex. A at 2.)  In that regard, the agreements may, logically, be deemed inextricably interconnected, creating doubt concerning whether the ACR "lease" truly should be construed as such.[12]  (See id.)  Indeed, Counsel for ACR specifically stated before the Bankruptcy Court that the two agreements "go together," prompting the Bankruptcy Court, in turn, to note that such relationship is "the point," because ACR's ground lease isn't "just a lease."  (Brown Cert., Ex. B1 at 60:13-18.)  The Bankruptcy Court therefore concluded that ACR's ground lease constitutes but one portion of an array of interconnected and non-lease documents.  (Id.)  Given the proffer, and the

---

[12] It is, of course, well settled that a party's identification of a document as a lease does not, without more, resolve all doubt concerning the manner in which to properly construe such document under applicable law.  See, e.g., In re PCH Assocs., 804 F.2d 193, 199 (2d Cir. 1986) (noting that courts should "look to the circumstances of the case and consider the economic substance of the transaction rather than "the locus of title, the form of the transaction or the fact that the transaction is denominated as a 'lease'").

information available to the Bankruptcy Court, the Court cannot, at this time, find that the Bankruptcy Court had no objective basis to find ACR's lease subject to a bona fide dispute. Therefore, the Court does not find that ACR has demonstrated a likelihood of success on the merits of this issue on appeal. See In re Global Home Prods., LLC, 2006 WL 2381918, at *1.

### b. Amenity Tenants

With respect to the Amenity Tenants, the Bankruptcy Court similarly concluded that the Amenity Tenants' leases presented bona fide disputes, because the debtors relied upon such entities "to provide their signature dining, nightlife, spa and retail experiences," thereby rendering the Amenity Tenants and IDEA more akin to partners than traditional lessees. (Brown Cert., Ex. B1 at 54:9-23.)  In so finding, the Bankruptcy Court relied upon (and, in essence, cited to) counsel for the Amenity Tenants' own statements that the Amenity Tenants act, "in every sense, [as] partners of the Debtors," rather than mere tenants. (Id.)

Indeed, the Amenity Tenants' submissions before the Bankruptcy Court are replete with references to the Amenity Tenants' partnership with the Debtors.  (See, e.g., Zakia Aff., Exs. I & K.)  By way of example, the Amenity Tenants specifically represented to the Bankruptcy Court that,

32

> The Amenity Tenants are, in every sense, partners of
> the Debtors, for better or for worse. [And,] [a]s
> partners of the Debtors' enterprise, the Amenity
> Tenants have a tangible and particular interest in the
> Debtors' efforts to sell their assets. Whomever
> purchases the Debtors' assets will, in essence, be the
> Amenity Tenants' new partner. To that end, the Amenity
> Tenants should be involved in the process by which
> this new partner is selected. Additionally, the
> Amenity Tenants are interested in ensuring that this
> process is used to find a suitable new partner, and
> not as a means to illegally strip the Amenity Tenants
> of their leasehold rights.

(Zakia Aff., Ex. I at 3; see also Ex. J at 2 ("the Amenity

Tenants recognize that they are essential to the success of the

Debtors' operations")).  In so stating, the Amenity Tenants

arguably conceded the meritorious nature of the argument they

opposed before the Bankruptcy Court, namely, that no bona fide

dispute existed with respect to the nature of the Amenity

Tenants' agreements.

Moreover, in connection with the Bankruptcy proceeding, the

Debtors themselves appear to have "regularly refer[red]" to the

Amenity Tenants as their "partners," which infers the Debtors'

own interpretation concerning the manner in which to

characterize the Amenity Tenants' interests.  (Zakia Aff., Ex. J

at 2 (asserting that the Debtors "regularly refer to the Amenity

Tenants as their partners"); Zakia Aff., Ex. K at 2 (same).)

In light of these representations, and the information

available to the Bankruptcy Court, the Court cannot, at this

time, find that the Bankruptcy Court had no objective basis to

find the Amenity Tenants' leases subject to a bona fide dispute. Therefore, the Court does not find that ACR has demonstrated a substantial likelihood of success on the merits of this issue on appeal.  See In re Global Home Prods., LLC, 2006 WL 2381918, at *1 (noting the standard for likelihood of success on the merits).

### c. IDEA

With respect to IDEA, the Bankruptcy Court did not specifically reference the parties' positions concerning whether a bona fide dispute existed with regard to IDEA's agreement. The Bankruptcy Court's own Opinion, however, makes plain that the Bankruptcy Court considered such positions.  (See Brown Cert., Ex. B1 at 55:15-19 (finding a bona fide issue in dispute with respect to ACR, the Amenity Tenants, and IDEA).)  Indeed, because IDEA and the Amenity Tenants, collectively, provided the Debtors, in the Judge's words, with "signature dining, nightlife, spa and retail experiences," it is clear that the Bankruptcy Court's discussion applies equally to both the Amenity Tenants and IDEA.[13]  (See Brown Cert., Ex. B1 at 54-55 (emphasis added).)

---

[13] The Court finds IDEA's position that the Bankruptcy Court's decision lacked the specificity required by Federal Rule of Civil Procedure 52 without merit.  The Court agrees with the Debtors that Federal Rule of Civil Procedure 52 does not require the level of specificity asserted by IDEA.  (Debtors' Br. at 24 n.16)  Indeed, Rule 52 only requires that the finds be adequate

Moreover, the Bankruptcy Court possessed inherent familiarity with IDEA's multiple adversary actions—actions in which IDEA <u>specifically</u> sought a declaratory judgment concerning the nature of IDEA's agreement with the Debtors.  (<u>See, e.g.</u>, Zakia Aff., Exs. E & F.)  Even if IDEA's declaratory judgment action does not constitute a concession of a bona fide dispute regarding whether the IDEA Agreement qualifies as a lease, the pendency of this litigation arguably provides some objective basis, at a minimum, to find, as the Bankruptcy Court did, some bona fide issue in dispute.[14]

---

to sufficiently explain the basis for relief, such that an appellate court can perform its review function.  <u>See</u> <u>Baldinger v. Ferri</u>, 483 F. App'x 708, 712 (3d Cir. 2012); <u>Stoetzner v. U.S. Steep Corp.</u>, 897 F.2d 115, 119 (noting that Rule 52 only requires that lower courts make "specific findings"); <u>Richerson v. Jones</u>, 551 F.2d 918, 924 (3d Cir. 1977) noting that the lower court's "failure to make a specific finding as to [a] critical fact (as required by Fed. R. Civ. Proc. 52(a)) would not require a reversal if the evidence and the court's other findings clearly elucidated the basis for its award).  Therefore, the Rule does not, as argued by IDEA, require perfect clarity, nor a precise explication of every facet of the lower court's determination.  Rather, the Bankruptcy Court's findings comply with Federal Rule of Civil Procedure 52, because it made specific findings concerning its determination of the disputed nature of leases, and elucidated, even if imperfectly, the basis for such findings, namely, its own knowledge the various agreements and other record evidence in the bankruptcy proceedings over many hard-fought months.

[14] On the record on January 20, 2015, counsel for IDEA argued, in essence, that the declaratory judgment action principally concerned IDEA's request for an energy easement, rather than an effort by IDEA to challenge the characterization of its Agreement.  Even if true, however, that fact alone does not sufficiently refute the existence of a bona fide issue in dispute, because, in answering IDEA's Complaint, the Debtors

Therefore, the Court does not find that IDEA has demonstrated a likelihood of success on the merits of this issue on appeal.

### iii.    The 365(h) Appellants Have Not Demonstrated a Strong Likelihood of Success on their Argument Concerning the Requirement of Adequate Protection under 363(e)

Finally, the Court turns to the 365(h) Appellants' positions concerning the adequate protection requirement under section 363(e).

The Court therefore notes that, in connection with a sale under section 363(f), section 363(e) mandates that adequate protection be provided to entities which have an interest in property used by the trustee or debtor-in-possession and "applies to property that is subject to any unexpired lease of personal property." See 11 U.S.C. § 363(e).  Permissible forms of protection include "cash payments" or "such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361(1), (3).  Section 361, however, provides only a non-exhaustive list of the methods of adequate protection, and "'[e]xactly what constitutes adequate protection

---

specifically denied that IDEA's Agreement constituted a lease. (See Debtors' Br. at 31.)  This also gave IDEA earlier notice that the Debtors had a bona fide dispute with whether the agreement was a true lease.

must be decided on a case by case basis.'"   In re Shaw Indus.,
Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (citations
omitted).  Given this, adequate protection would not appear to
require full, nor ideal, protection.  Rather, adequate
protection would appear to include that which suffices under the
circumstances.

　　　Here, however, the 365(h) Appellants argue that, under the
circumstance of this action, adequate protection of their
interests can only be achieved through the 365(h) Appellants'
continued possession of the "leased" premises.  (See, e.g.,
IDEA's Br. at 36-37.) It is undisputed, however, in the record
below that approval of the Polo North Sale under section 363(f)
(and the related rejection of the 365(h) Appellants' leases)
would enable the 365(h) Appellants to assert "'massive rejection
damage claims'" against the sale proceeds (Martin Aff., Ex. K at
48:23-25), a general, unsecured claim pursuant to section
365(g)(1).  See In re R.J. Dooley Realty, Inc., No. 09-36777,
2010 WL 2076959, at *7 (Bankr. S.D.N.Y. May 21, 2010) (citing In
re Ames Dep't Stores, Inc., 306 B.R. 43, 60 n.56 (Bankr.
S.D.N.Y. 2004)).

　　　Though the 365(h) Appellants assert an entitlement to more
(namely, possession), at least one court concluded that offering
a lessee a "possessory interest" as adequate protection,
effectively "catapult[s] it ahead of its position behind

secured, administrative, and priority unsecured creditors, in complete contravention of the priorities of the Bankruptcy Code." In re R.J. Dooley Realty, Inc., 2010 WL 2076959, at *7 (rejecting a lessee's adequate protection claim). Given the record before the Bankruptcy Court, the Court cannot, at this initial stage, find the Bankruptcy Court's decision in this respect so clearly erroneous as to warrant the issuance of a stay. See In re Key Book Serv., Inc., Nos. B-89-424, B-89-425, 1989 WL 221311, at *1 (D. Conn. 1989) (noting that a clear error standard applies to a review of the bankruptcy court's determination of adequate protection under section 363(e)).

Moreover, the Bankruptcy Court's failure to make specific findings concerning adequate protection under section 363(e) does not require any contrary conclusion. Notably, despite the Bankruptcy Court's failure to make specific reference to adequate protection under section 363(e), compliance with section 363(e) constitutes the necessary prerequisite to a free and clear sale under section 363(f). Therefore, in finding section 363(f) satisfied, the Bankruptcy Court necessarily found the interests of the 365(h) Appellants adequately protected.

The Court is constrained to note that it is more than arguable that granting possession to these alleged tenants in the present circumstances of a catastrophically failed casino-hotel concept would be no more "adequate" than what these

38

Appellants have received, namely, the right to assert claims for rejection damages or other relief as unsecured creditors.  While the result might well be different, as possession could be expected, in the case of an ongoing Chapter 11 enterprise, such is unfortunately not the case for the Revel.

For all of these reasons, the Court does not find that the 365(h) Appellants have demonstrated a likelihood of success on the merits of this issue on appeal.

### b. The 365(h) Appellants Will Not Suffer Irreparable Harm in the Absence of a Stay

With respect to this factor, the "'principal prerequisite for the issuance of a stay,'" the Court must consider whether the movant has demonstrated the potential for an actual and imminent, rather than remote or speculative, irreparable harm. In re Richmond, No. 14-41678, 2014 WL 5100705, at *4 (Bankr. E.D.N.Y. Oct. 10, 2014) (citations omitted).  Here, in arguing that irreparable harm will result in the absence of a stay, the 365(h) Appellants stress that consummation of the Sale Order, in its present form, would potentially render their claims on appeal statutorily moot, and would result in the loss of their possessory leasehold interests.  (See ACR's Br. at 19-21; IDEA's Br. at 38-39; Amenity Tenants' Br. at 15-16.)  The Court, however, finds both positions insufficient to demonstrate irreparable harm.

Notably, "a majority of courts" find the potential for mootness insufficient, by itself, to constitute irreparable harm.  In re Frascella Enters., Inc., 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) (citations omitted); see also In re Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, *10 (Bankr. D. Del. Mar. 27, 2001) (noting that, "'[i]t is well settled that an appeal being rendered moot does not itself constitute irreparable harm'") (citations omitted), aff'd, 322 F.3d 283 (3d Cir. 2003).  Consequently, the fact that the pending appeals could be rendered moot by the closing of the sale does not, without more, constitute irreparable harm.  "Indeed, if equitable mootness alone could serve as the basis of irreparable injury, a stay would be issued in every case of this nature pending appeal."  In re W.R. Grace & Co., 475 B.R. 34, 207 (D. Del. 2012).  The Court therefore finds this argument insufficient to support the issuance of a stay pending appeal. See In re Global Home Prods., LLC, 2006 WL 2381918, at *1 (finding the potential for mootness insufficient, without more, to demonstrate irreparable harm, and denying the request for a stay pending appeal).

Moreover, though the 365(h) Appellants assert that the loss of their possessory rights would result in irreparable injury, the 365(h) Appellants ignore that they have been without valuable possessory rights since September 2014.  Indeed, as

40

aptly observed by the Bankruptcy Court, "if I rule in [the 365(h) Appellants'] favor, what are they going to do in possession in a building that is not operating and closed?" (Brown Cert., Ex. K at 61:4-6.)  In that regard, the Court need not even credit the Debtors' position that "[s]uch value would be even more questionable following the liquidation that would likely result from a failed sale process," (Debtors' Opp'n at 45 n. 37), because it is entirely logical that the absence of any occupant in the Debtors' casino would leave the Appellants with, in essence, a possessory right in an empty and commercially-unproductive building.[15]

     For these reasons, the Court finds that the 365(h) Appellants have not met their burden to demonstrate irreparable harm.

### c. The Debtors May Face Substantial Injury in the Event of a Stay

     With respect to the third factor, the 365(h) Appellants must present "satisfactory evidence that imposition of the stay will not substantially injure other parties in the litigation." In re W.R. Grace & Co., 475 B.R. at 208.  In arguing that this

---

[15] The situation is different with regard to ACR, whose power plant continues to function for the benefit of Debtors' property.  It is logically and economically not conceivable that the purchaser, interested in maintaining and developing the premises, would evict ACR and plunge the project into darkness. This was acknowledged, if not promised, by counsel for Polo North at the hearing on this motion.

factor favors the issuance of a stay, the 365(h) Appellants
principally argue that the Polo North Sale can continue,
irrespective of a stay, thereby insulating the Debtors, the
Purchaser, and presumably, Wells Fargo (the Debtors' bridge loan
provider), from any resultant injury.  (See Amenity Tenants' Br.
at 17; IDEA's Br. at 39; ACR's Br. at 21-22.)  The 365(h)
Appellants, however, ignore the fragility of Debtors' existence
and the uncertainty concerning the ultimate consummation, if
any, of the sale with Polo North.

Indeed, despite the 365(h) Appellants' assertions, the
executed APA does not contractually obligate Polo North to
complete its acquisition of the Debtors' assets, nor does it
provide the Debtors any right to compel Polo North's specific
performance.  Rather, it provides Polo North with an easily
terminable $10 million option to purchase the Debtors' assets.
Given these circumstances, and in light of counsel for Polo
North's various representations before the Bankruptcy Court and
in this Court, the Court must credit the Debtors' position that
the issuance of stay would present "a real and substantial risk
that Polo North would elect not to proceed with closing."
(Debtors' Br. at 42 (citation omitted).)  In that regard, the
Court notes that, the palpable risk of losing a ready buyer
demonstrates, without more, a risk of substantial harm to the

Debtors.[16] See Ferrone, 516 B.R. at 771 (finding that a stay would risk losing the ready buyer and leaving the property to be sold for a much lower value, resulting in "substantial harm" to the debtor and its creditors); In re Trans World Airlines, Inc., 2001 WL 1820325, at *11 (concluding that "substantial harm" would be caused by staying the sale because "[t]here is a very serious risk of losing a sale transaction which materially benefits . . . creditor constituencies" and because a stay order posed the threat of "an immediate and precipitous decline in the financial affairs of [the debtor] followed by a very high probability . . . of liquidation"); In re Edwards, 228 B.R. 573, 581 (Bankr. E.D. Pa. 1999) (concluding that "the risk to the estate of losing [the] sale [was] far greater than the loss...of the opportunity to preserve [an] objection").

Moreover, even if the Court considered the Debtors' position concerning Polo North's election not to pursue this sale as an unsubstantiated and speculative allegation of harm, the Court must still credit the Debtors' own perspective

---

[16] Moreover, such an election would indisputably reduce the value of the Debtors' estates—potentially requiring the Debtors to strip all "easily-liquidated assets"—therefore resulting in drastically negative impact on the Debtors, their estates, and the bankruptcy proceeding.  In that regard, the issuance of a stay may also thwart creditors along their lengthy path to recovery from the Debtors.  See In re W.R. Grace & Co., 475 B.R. at 208.

concerning its untenable position.  In that regard, the Court notes that the Debtors' Chief Restructuring Officer, Shaun Martin, certified that the Debtors engaged in an exhaustive search for a potential buyer of the Debtors' assets.  (Martin Dec. at ¶ 8.)  The search, which began in November 2013, initially "focused on approximately thirty (30) strategic investors with gaming experience," and included due diligence and "extensive negotiations."  (Id.)  Despite these initial efforts, however, the Debtors reached no final transaction and "the Debtors' liquidity issues forced them to file" chapter 11 petitions. (Id. at ¶ 9.)  Following their chapter 11 petitions, the Debtors "expanded marketing efforts" and "contacted over 200 potential investors."  (Id.)  Despite all of these efforts, only two qualified buyers executed asset purchase agreements, and after the initial purchaser repudiated its deal, Polo North now stands, after a year's efforts, as the only potential acquirer of the Debtors' assets.  (See generally id.)  And, Mr. Martin certifies that, with each passing day, the Debtor becomes more imperiled.  (Id. at ¶¶ 21-26.)

For all of these reasons, the Court concludes that entry of a stay would detrimentally impact other parties—notably, the Debtor and its other creditors—involved in this litigation.

### d. The Public Interest Militates Against a Stay

As the parties requesting a stay pending appeal, the 365(h) Appellants bear the burden of demonstrating a legitimate and compelling public interest in support of a stay.  In re Am. Land Acquisition Corp., No. 12-76440, 2013 WL 2481534, at *10 (Bankr. E.D.N.Y. June 10, 2013) (citing In re Taub, 470 B.R. 273, 277 (E.D.N.Y. 2012) (citation omitted)). In considering a request for a stay pending appeal, courts consider an array of public interest concerns, including "'the expeditious administration of bankruptcy cases'" and whether the stay would impair and obstruct the debtor's "'efforts to collect, liquidate and distribute assets to creditors of the estate.'"  Id. (citations omitted).

The 365(h) Appellants have not identified any significant public interest that will be furthered by the issuance of a stay.  Rather, the 365(h) Appellants hinge their discussion of this factor upon the purportedly "strong public policy in favor of [the] correct application of the law," (Amenity Tenants' Br. at 18), the "strong public policy interest in ensuring parties receive their statutory entitlements under the Bankruptcy Code and preventing a deprivation of property rights," (ACR's Br. at 22), and the public policy interest in maintain the venues that help to ensure "the continuing viability of casino and hospitality operations at the form Revel location."  (IDEA's Br.

45

at 40.)  However, even if the Court accepted these arguments as expressions of applicable public policy concerns, such concerns would not sufficiently outweigh the far more prevalent interest in facilitating the success of bankruptcy proceedings and enabling such proceedings to reach finality.

Indeed, a court's balancing of the '"interests of []
affected parties'" must be "'guided by the overriding goal of ensuring the success'" of the bankruptcy proceeding.  In re Country Squire Assocs. of Carle Place, L.P., 203 B.R. 182, 184 (2d Cir. BAP 1996) (quoting Pioneer Investment Services Co. v. Brunswick Assocs. L.P., 507 U.S. 380, 389 (1993)).  For that reason, in the context of bankruptcy proceedings, public policy generally favors "affording finality to bankruptcy judgments." In re W.R. Grace & Co., 475 B.R. at 208; see also In re Genesis Health Ventures, Inc., 280 B.R. 339, 346–47 (D. Del. 2002) (same). Indeed, in Nordhoff Investments, Inc. v. Zenith Electronics Corporation, 258 F.3d 180 (3d Cir. 2001), the Court of Appeal discussed the public policy favoring finality in bankruptcy litigation in the context of a stay, stating that:

> Where, as here, investors and other third parties
> consummate a massive reorganization in reliance on an
> unstayed confirmation order that, explicitly and as a
> condition of feasibility, denied the claim for which
> appellate review is sought, the allowance of such
> appellate review would likely undermine public
> confidence in the finality of bankruptcy confirmation
> orders and make successful completion of large
> reorganization like this more difficult.

46

Id. at 191 (citations omitted).  Here, as stated above, the
Debtors make palpable claims that "a failed sale process ... and
subsequent liquidation of the Debtors' assets [would] likely
leave the Revel Casino Resort vacant and unused for the
foreseeable future"—clearly frustrating the bankruptcy
proceeding, particularly given the absence of any alternate
purchaser waiting in the wings. (Debtors' Br. at 46 (citing
Martin Dec. at ¶¶ 24-25).)  The Debtors further represent that
such result would result in "the permanent loss of approximately
4,000 jobs" and cause "substantial detriment to the City of
Atlantic City and the surrounding areas," possibly hampering
further reorganization efforts.  (Id.)  Consequently, even if
the Court questioned the Debtors' representations, the public
policy most strongly implicated by this litigation favors the
facilitation of the asset sale, and, accordingly, weighs against
the imposition of a stay.  See In re. W.R. Grace & Co., 475 B.R.
at 208-09 (finding that the public policy favoring finality in
bankruptcy actions "strongly weigh[ed] against the imposition of
a stay").

     For all of these reasons, the Court will deny ACR, IDEA's,
and the Amenity Tenants' motions to stay pending appeal, and
therefore turns to IGT's motion.

**B. IGT's Motion to Stay**

The Court readily dispenses with IGT's motion to stay, and need not even address IGT's likelihood of success on its appeal.

Rather, it suffices to note that IGT has not, and cannot, demonstrate that it would suffer an irreparable harm in the absence of a stay, that other parties would not be substantially injured, nor that the public interest favors the entry of a stay.  Consequently, even if the Court assumed that IGT demonstrates some potential for success on the merits, an evaluation of the remaining factors would still counsel against the issuance of a stay.

Critically, as stated above, monetary loss alone does not constitute irreparable harm.  See In re W.R. Grace & Co., 475 B.R. at 207 (citations omitted).  Rather, irreparable harm is "an injury that 'cannot be redressed by a legal or equitable remedy[.]'"  Id. at 207-08.  Here, however, it appears undisputed that IGT would retain "the same priority [] it currently holds," irrespective of the result of pending appeal, thereby precluding IGT from ever claiming that it would derive irreparable injury from the denial of a stay.  Indeed, the Sale Order specifically provides that,

> the Purchase Price paid to the Debtors on the Closing
> Date shall be held by the Debtors in a segregated
> account and shall not be disbursed except as provided
> in or authorized by further older; provided, however,
> that any party seeking entry of such order must do so

48

> on reasonable notice to all parties-in-interest and
> all parties-in-interest reserve all rights to object
> to the release of proceeds from the segregated
> account.

(See Brown Cert., Ex. A.)  Counsel for the Debtors, accordingly, specifically acknowledged on the oral argument record on January 20, 2015, that such provision serves to preserve IGT's secured interest, and that the amount of such interest will be determined by the Bankruptcy Court prior to any sale distributions.

Moreover, in rejecting IGT's position below, the Bankruptcy Court similarly concluded that such language entitled IGT to a lien on the sale proceeds, and that IGT's right to challenge any dispute concerning the distribution of the sale proceeds would be preserved, pending further hearing. (See Martin Aff., Ex. K at 96:19-24, 98:7-8, 99:7-18.)  While the ensuing allocation proceedings to determine the extent and validity of liens, including IGT's purchase money lien, may be tedious, it is the process provided by law and it affords adequate protection.

For these reasons, and for those stated above concerning the public interest and the substantial injury to other parties in the event the Court issues a stay,[17] the Court will deny IGT's motion to stay pending appeal.

---

[17] As stated above, Mr. Martin, the Debtors' Chief Restructuring Officer states that any delay in the sale, including delay associated with the Sale Order changes requested by IGT, would

## V.    CONCLUSION

For all of these reasons, the Appellants' motions to stay the Bankruptcy Court's January 8, 2015 Order pending appeal will be denied.  An accompanying Order will be entered.[18]


**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

**January 21, 2015**
Date

---

severely imperil the Debtors.  (See Martin Dec. at ¶¶ 21-26.)
Consequently, for the same reasons stated above, the Court finds
that a stay would potentially cause substantial injury to the
Debtors.
[18] The Court, accordingly, need not address the parties'
positions concerning the posting of a supersedeas bond.